SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CIVIL PART
MERCER COUNTY, NEW JERSEY
DOCKET NO. MER-L-1641-12
A.D.#____________________

T3

| | |
|---|---|
| ROBERT KENNY, Plaintiff, v. SUSAN M. DENBO and RIDER UNIVERSITY, Defendants. | TRANSCRIPT OF MOTION HEARING |

Place: Mercer County Civil Courthouse
175 South Broad Street
Trenton, NJ 08650

Date: October 26, 2012

BEFORE:

THE HON. DARLENE PEREKSTA, J.S.C.

TRANSCRIPT ORDERED BY:

ROBERT KENNY, ESQ., Pro Se Plaintiff
103 Carnegie Center, Suite 300
Princeton, NJ 08540

APPEARANCES:

ROBERT KENNY, ESQ., Pro Se Plaintiff

STEVEN GERBER, ESQ. (Gonzalez Saggio & Harlan LLP)
DR. JAMES CASTAGNERA, ESQ. (Rider University)
Attorneys for Defendants Rider University and Professor Susan Denbo

Transcriber, Kimberly Upshur
**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, NJ 08619**
**(609)586-2311**
**FAX NO. (609)587-3599**
**E-mail: jjcourt@jjcourt.com**
**Website: www.jjcourt.com**

Audio Recorded
Audio Operator, DaGenia Clark

**I N D E X**


| | **PAGE** |
|---|---|
| **ARGUMENTS** | |
| By Mr. Gerber | 6 |
| By Mr. Kenny | 26 |
| By Mr. Gerber | 32 |
| By Mr. Kenny | 43 |




THE COURT: We're on the record now in the matter of Kenny versus Denbo and Rider University, Docket L-1641-12. May I have counsels' appearances please?

MR. KENNY: Robert Kenny, plaintiff pro se.

MR. GERBER: Good morning, Your Honor. Steven Gerber, Gonzalez Saggio & Harlan, 155 Willowbrook Boulevard, Wayne, New Jersey, on behalf of defendants Rider University and Professor Susan Denbo. Also present to my right as we were at the first session of the oral argument is James Castagnera, Esq., a member in good standing in the Bar of Pennsylvania, Associate General Counsel and Associate Provost, if I have his title correct, of Rider University.

THE COURT: Okay. Thank you, counsel. And as Mr. Gerber said we were here previously, I heard extensive argument, I asked counsel -- and thank you for your compliance, you kept it to the page limit that I asked for -- for supplemental briefs on the issue -- actually it's more specific briefs I should say, because it was covered in the initial briefing, but on the issue specifically addressing the preemption issue in light of cases involving defamation claims.

And I did review those briefs. And I think each party, you know, cites the different case law,

distinguishes some case law differently. Also, before I forget I just want to say that we did not hear argument the last time, because we kind of ran out of time, on the issues -- the other issues. I think there were other grounds that defendant --

MR. GERBER: Yes, numerous grounds.

THE COURT: -- moved to dismiss. And again, just for the record, this is defendant's motion to dismiss in lieu of an answer for failure to state a claim. So the defense argues not only that should this be preempted because there is a collective bargaining agreement and there was a settlement at arbitration, and this is as the defense claims, they claim that the issue is so inextricably intertwined with what would be decided under the CBA that it is preempted and this Court doesn't essentially have jurisdiction.

Then there is also the issue that plaintiff lacks standing to attack the settlement of the arbitration and grievance also because they allege privilege because the statements were made in connection with an investigation, and they also allege qualified privilege because the statements that the -- the alleged defamatory statements were published to other professors and which defendant claims have a common interest.



And also they allege failure to state a claim because -- for invasion of privacy. That was a different point --

MR. GERBER: And for false light.

THE COURT: -- a different count rather of plaintiff's complaint. And also another count plaintiff claims failure to state a claim of the false light invasion of privacy count.

And I also think that at some point, too, I might have missed you alleged that the truth is the absolute defense to defamation.

MR. GERBER: That's correct, Your Honor.

THE COURT: Okay. Let's take that point actually first. What -- and I looked again through the certification that you submitted the first time. As I said I read the supplemental briefs. Where's the actual letters to the provost and what have you? I mean, Professor Denbo, she does attach the e-mails, okay, and I don't know that anybody's arguing that the e-mails between herself and Professor Kenny are what the defamatory -- that the defamation claims stem from. It seems that the defamation claim stem from what she sent to, and I don't --

MR. GERBER: Department chair and others.

THE COURT: Yes. Right. And that was what

you had argued the last time we were here as, well, she had to do that, because that's part of the whole process of her enforcing her rights under the collective bargaining agreement and that just kind of starts the ball rolling, because if she can't talk to the department chair or notify the department chair that there may be a problem for him to -- he or she to investigate how else is that suppose to happen? So where are those letters?

MR. GERBER: That letter, Your Honor, is the e-mail in question that he claims is defamatory as Your Honor noted to the department chair and three other members of the faculty of that department tenured copying two University officials over the blackboard. May I start, Your Honor, with --

THE CORRECT: No, but -- okay, so you're telling me --

MR. GERBER: So that is the chain of events and that is the complaint. There is no formal written separate letter of complaint.

THE COURT: Okay. Hold on, because then maybe I'm misreading her certification.

MR. GERBER: Paragraph 18 I think starts it, Your Honor.

THE COURT: Hold on. Okay. So in Paragraph



18 and Paragraph 19 when she says -- 18, when Mr. Kenny continued to ignore my request for information about his use of my course materials I e-mailed only those individuals at Rider who would be able to protect my intellectual property rights for the course materials under the CBA. She lists them. Okay. And then she says, 19, I also e-mailed the two full-time members of the legal study section of the marketing advertising legal studies department, she lists them, because I wanted the department to institute policies to prevent similar incidents from occurring in the future.

Those e-mails are where?

MR. GERBER: They're attached to Mr. Kenny's complaint. And they're quoted in the amended complaint.

THE COURT: Well, are they the e-mails that she attached as Exhibit B?

MR. KENNY: Yes.

MR. GERBER: Just a minute. No, they are not, Your Honor. They are the e-mails with -- and they're referenced in the brief -- they are the e-mails -- if you want to refer to the amended complaint as now filed, Your Honor.

THE COURT: Hold on. First amended complaint. Okay. Which paragraph -- which --

MR. GERBER: I think it's on Page 7. Paragraph 44 of the first amended complaint alleges, and I have a two-sided copy, Judge, because I was down in Cumberland so I tried to save some paper. It says, Professor Denbo alleged distributing the e-mail to five administrative professionals in the faculty expressly. And then --

THE COURT: Well, these are all the e-mails though that -- they're in maybe a different form, but they're in the -- okay.

MR. GERBER: Right. Bottom of Page 7, Your Honor, January 25th, 2012 e-mail. And she copies the others.

THE COURT: Yes. No. But then look at Page 8 of the complaint and it says 45. Sometime --

MR. GERBER: Oh. There's no evidence whatsoever of that, Your Honor. There's no evidence of it, we have no evidence of it. There is no evidence of it. That is made up from whole cloth. That is a red herring. I represent to the Court, and Mr. Castagnera can represent to the Court that it was Professor Denbo's e-mail to the department chair and other faculty which was the complaint that started the grievance process. May I approach, Your Honor?

THE COURT: Well, no, you may not, because



that's what I'm missing here from actually Denbo. Because that's not how -- I understand what you're saying now, and I, you know, understand as an officer of the court you make these representations, but you are not Professor Denbo, and her certification doesn't say that. So while I understand that she doesn't attach anything she does say -- I mean, if the representation is that the only way she notified the individuals that she believed her rights under the collective bargaining agreement were being violated, because she believed that Professor Kenny was using her syllabus or however else she -- what she said to them, if she just did that by copying this chain of e-mails without anything else -- is that the representation? No statements, no writings, just forward a bunch of e-mails.

MR. GERBER: As far as we know, Your Honor, and we've spoken to her about it. And may I explain why, Your Honor?

THE COURT: Yes.

MR. GERBER: May I approach? Your Honor, I've been in front of Judge Geiger since Monday, and I was down in Cumberland County since early Friday morning, and I realized very early this morning when I was finally at home -- I got home last night, that in

Exhibit A to Dr. Castagnera's certification which were excerpts of the CBA there was a portion that might pertain to this issue. So may I approach, Your Honor?

THE COURT: Okay. Yes, I didn't think we had the whole CBA previously.

MR. GERBER: That is correct, Your Honor. May I tender a copy to Mr. Kenny? Mr. Castagnera who affirmed to his certification, he's here, can testify this is an article, Article XV. If you direct your attention, Your Honor, to the bottom page number of it, it's 83, it's the third page of the document.

THE COURT: Okay.

MR. GERBER: It starts with the words, in the event the University receives an allegation of misconduct or other allegation that may lead to an adverse employment action against bargaining unit member, i.e., against Mr. Kelly -- Kenny, with the allegations, blah, blah, blah, could occur the provost shall determine -- if you go to the following page -- in all other cases the provost will evaluate such allegation, make such preliminary determination of what to do about it.

If you now turn to Dr. Castagnera's certification, Exhibit C, Your Honor.

THE COURT: Hold on.



MR. GERBER: Your Honor, I can pass it up if it's easier.

THE COURT: No, no, I have it. Here I go. Okay. Exhibit C?

MR. GERBER: Yes. So what happened, Your Honor, is the faculty member complains to her department chair, Dr. Sprotzer, Dr. Sprotzer as -- in his responsibilities as the department chair forwards that allegation to the dean of the college. At the time the dean was Dr. Larry Newman. Okay.

THE COURT: Okay. And I'm not -- okay. I see where you're going, counsel, and frankly, you know, I'm not saying that doesn't -- that may change things, but I'm not happy that all this is -- and I understand you were in court, everything, trial, but let me tell you in my review of this where I was coming from, okay, I understand the arguments we had the last time, and I kept saying, well, maybe what she did was as innocuous as saying could you please, provost dean, whoever is in charge of looking into matters if collective bargaining agreements are violated, could I believe my collective bargaining rights have been infringed upon or violated because I believe that Professor Kenny unauthorized -- there was unauthorized use of my syllabus. It might be as innocuous as that in terms of a statement to, as you

get the ball rolling.

But my point is in reviewing all the cases that deal with preemption and defamation what if in her letter, if there was one, now you're telling me there wasn't one, but it wasn't clear, still not clear to me in terms of any certifications that there wasn't anything and that the only way that Newman or whoever got wind of her complaint was hit the forward button and here's a chain of e-mails, and that there were no other statements made, no other letters written.

But what if she wrote a letter, or made a statement, and said -- I'm not saying she did, but let's say she did -- called up, whether it was in the heat of anger or whatever, and said, I can't believe Professor Kenny is a thief and a liar and a cheat and -- well, wait a minute. Now maybe that goes beyond just what the allegations or beyond what the collective bargaining agreement covers. Because frankly I didn't even have this article which set forth any procedures about what was to be utilized in situations like this. All I had prior to this was I have a collective bargaining agreement that says professors at Rider have intellectual property rights to their own materials that they create. And, okay, but I don't know that in a defamation action that requires an interpretation of



the collective bargaining agreement.

Now you're giving me a whole, basically a procedure, I guess, I haven't had the time to read this, but to be filed in cases where a professor feels somebody else employed by Rider, you know, violated the collective bargaining agreement and what's to be done. Maybe that does change things. Maybe then, you know, everything that needs to be decided is decided or the same issues are decided and there may be -- that might affect the preemptive.

But, again, there are just so many holes in this. I'm getting this today. I still -- like I said, it's not clear here when -- what the e-mails --

MR. GERBER: Your Honor --

MR. GERBER: Can I --

MR. KENNY: -- it might be helpful --

THE COURT: Let me hear from Professor Kenny.

MR. KENNY: It may be helpful if I clarify what made it into my complaint. I haven't seen a letter. All I knew -- I said on information and belief Professor Denbo. And the reason I said that, I wasn't making it up out of whole cloth, there must have been some communication, because it eventually got to the provost. And the provost is not addressed in these e-mails. So if this is the source of the complaint

somehow it made it to the provost.

Which brings up a related point which is without discovery we don't know that those e-mails just went to those five people including two of our colleagues with no managerial authority. It must have gotten to --

THE COURT: You're alleging that she accused you of theft of --

MR. KENNY: Right. And we have some issues with Paragraph 18 over her certification, but I'll leave those for today. I just want to clarify that since the provost was not addressed in those e-mails it must have made it to the provost somehow. And I assumed, without knowing, and I said on information and belief, she must have filed a formal complaint. And that was an assumption on my part.

THE COURT: Okay.

MR. GERBER: May I respond briefly, Your Honor?

THE COURT: Yes.

MR. GERBER: I understand where the Court's concern is. I cannot undo our failure to include Article XV if that's the number that's in front of Your Honor. I cannot undo that. But let me address one point. May I direct, respectfully, the Court's



attention to Article XX --

MR. CASTAGNERA: 32.

MR. GERBER: -- XXXII. It's in Exhibit B. The printout of the article actually should read Roman X 3 and then Roman 2. But on the copy --

THE COURT: Wait. What is it again, Exhibit --

MR. GERBER: Exhibit A to Castagnera's cert.

THE COURT: Okay. And it's what page?

MR. GERBER: Your Honor, if you go through the papers beginning what I just handed you, a faculty member --

THE COURT: What page?

MR. GERBER: I'm starting on Page Number -- I'm going to first refer to Page Number 129 and I'm then going to refer to Page Number -- on the numbered pages, 175.

THE COURT: Okay. I have those pages. Go ahead.

MR. GERBER: If I can, Your Honor, the grievance is filed by the union and Mr. Kenny. The grievance is filed in response to discipline set out by the provost. That is all integral to the collective bargaining. The e-mail complaint from Dr. Denbo goes to the department chair, he reports it to the dean, the

dean as set forth in Exhibit C having reviewed the facts of this matter it's my conclusion that your -- it's the University doing that in response to her complaint which is part of what led to the investigation.

Then a few days later in Exhibit D Mr. Kenny under his law firm letterhead responds to the provost with a letter basically appealing Newman's finding. In Exhibit E, four days later, the provost of the University responds to Jeffrey Halpern, Professor Halpern who's the grievance officer and contract administrator. Okay. So Mr. Kenny in response to discipline that wasn't post pursuant to the CBA starts the grievance. Denbo's letter relates facts about her protected intellectual property rights under the agreement.

THE COURT: Right. And here's my question, counsel, isn't it possible -- we'll consider this as a hypothetical, okay -- isn't it possible that the -- well, it wasn't decided by the arbitrator, but let's just say it was, okay, and say this went to a full -- the full hearing and a decision and the arbitrator said yes, I find that the intellectual property rights to the syllabus belonged to Professor Denbo, right, that's one fact, and that the suspension of Professor Kenny



was appropriate, because that's what the arbitrator was supposed to decide, right, under the CBA.

MR. GERBER: Yes, Your Honor.

THE COURT: Okay. But it doesn't -- the arbitrator doesn't decide issues of intent, right. So even if the syllabus was used -- it was an unauthorized use -- Kenny's saying he thought he had authorization, it was given to him by, I think, the dean, what I'm saying is those are different elements than -- and I don't know like I said what she said, because I felt like there was this missing piece. Now you're telling me there is no missing piece it's only the e-mails. But if, as it is alleged in the complaint, and I have to at this stage of the game, right, give kind of every inference --

MR. GERBER: Every reasonable inference.

THE COURT: Every reasonable inference. Okay. But I don't see it in her certification saying I didn't have any other communications with anybody. All I did was hit the forward button. That's not in her certification. You're telling me that, but that's not in her certification.

So if I'm giving every reasonable inference, and if in fact she did, and like I said it might have been in the heat of anger say, he stole it, he's a

thief, he's a cheat, that, a determination of those -- that is not just completely subsumed or the same issues that the arbitrator would be deciding under the CBA because you could violate the CBA. You could be found to have -- or the arbitrator could find that the action taken by the University was appropriate under the circumstances. But it still doesn't mean that he stole anything.

MR. GERBER: May I respond, Judge? The answer is, respectfully, Your Honor, that argument inflates the law. If she had, hypothetically, instead of sending the e-mail as the means of complaint, and the e-mail says the language that Mr. Kenny allegedly -- can I have the amended complaint, Mr. Castagnera, or do I have it?

MR. CASTAGNERA: I think you have it over there.

THE COURT: But, see, you say well, that's what he alleges. He does allege that. And he says she sent those e-mails. But then he goes further and says upon information and belief she accused me of theft.

MR. GERBER: Well, Your Honor --

THE COURT: It could be the same thing, it could be two different things.

MR. GERBER: Your Honor, let's suppose she



never sent an e-mail to the department chair, and she calls up the department chair, under Your Honor's scenario, whether she calls up or she writes, okay, and she says Professor Kenny stole my syllabus, it's identical virtually word for word to what I did, it's a violation of my copyright rights, I complained to him and he hasn't -- and he did steal it. And I want you to do X. And let's suppose she doesn't even say that, Your Honor. She is now reporting a violation by a member of the collective bargaining unit of her rights under the collective bargaining agreement.

THE COURT: What I'm missing --

MR. GERBER: But even if she said he was a --

THE COURT: Wait a minute. What I'm missing is -- and maybe if I read this article that you've just given me, the part of the collective bargaining agreement, maybe that clears it up. But what I had before was the collective bargaining agreement says, okay, a professor has rights to the materials that they create, the syllabus, what have you, but it didn't tell me anything under the collective bargaining agreement as to, and here's the procedure that happens if somebody violates those rights.

MR. GERBER: Actually, respectfully, Your Honor, I think the Court is with the certified paper

arguably missing the issue. The issue is somebody says you've violated my rights. It is not the individual who commences the discipline, it is the University. The University -- here's example. Mr. Castagnera and I are co-workers in a factory. I see Mr. Castagnera steal some stuff. I go to the foreman, not a shop steward, the foreman, management and say I saw Mr. Castagnera steal some stuff. The foreman does some investigation, i.e., -- actually what the foreman do is send it up to Dr. Sprotzer --

THE COURT: Okay. But here are you -- counsel, are you using the term steal and unauthorized use interchangeably?

MR. GERBER: Your Honor, it wouldn't matter whether she said steal or used it unauthorized. He violated my rights. He could violate my rights by using it without authorization whether he intended to or not. He could use it -- and how he could do so without I don't know. He could also use it by just stealing it. Knowing it was mine, knowing he shouldn't do it he did it.

THE COURT: Okay. But aren't those two different things --

MR. GERBER: No. They're not --

THE COURT: -- in terms of defamation?



MR. GERBER: They may be two different things for defamation, Judge, but they're the same under the collective bargaining agreement. Somebody could be disciplined under this collective bargaining agreement, and was, for unauthorized use without necessarily reaching a conclusion that he did it deliberately. He's got a member -- he's a member of the CBA, he's a party to the agreement, they all have the agreement, the agreement all says you can't use somebody else's syllabus. Whether he did it intentionally or unintentionally it's of no moment.

THE COURT: Right. But that's what he's saying is the defamation.

MR. GERBER: But, Your Honor, if it was intentionally. Let us suppose under the Court's scenario that in fact he did it intentionally. And I'm not going to argue whether he did or didn't. I think that's for another day, and I don't think it's going to ever be for a day. But if he did it intentionally and she said he stole my syllabus, he stole my intellectual property under the agreement, and reports that to a department chair who is a direct report to the dean of the college just like in my scenario, Jim Castagnera stole materials, I go to Your Honor's courtroom deputy, he's the manager of that shift, it's above his pay

grade, he refers it to the vice president of human resources, the dean of the college. The dean investigates it. The dean, Exhibit B, issues a letter. Mr. Castagnera, a member of his collective bargaining unit goes to his union and says I disagree with that. I want to grieve that there should be discipline. It goes up to the next step, the president to the company.

THE COURT: I get how it gets there. I'm not saying -- I'm just saying that that -- and if Professor Denbo said that's how it happened, I never spoke to the provost or whether she did or didn't, but if she's saying that she just forwarded these e-mails and that's the only way that this kind of made it up the chain then I'd like her to put that in a certification.

MR. GERBER: We'd be happy to that, Your Honor.

THE COURT: Okay. All right. Mr. Kenny, I'm going to give you a short time to --

MR. GERBER: Make --

THE COURT: Yes. And then we're going to go back to some of the other --

MR. GERBER: Right. And, Your Honor, a number of the defamation cases that were preemptive involved actual theft. So somebody said somebody else stole it. They stole something.



THE COURT: Yes, I'm not -- I think you're missing my point.

MR. GERBER: No, no. I --

THE COURT: I'm saying that if there's things that are inextricably tied to -- which would require an interpretation of the collective bargaining agreement then I understand preemption. But what I'm saying is I don't know in what I've been given here -- now I'm given other stuff today and other representations that are made, and you said she's going to send another certification -- but that's where I'm saying there was a hole in that argument before, because you could interpret -- you could reach this whole defamation issue without interpreting -- on what I had before without interpreting the collective bargaining agreement.

MR. GERBER: I guess, Your Honor, if the allegation in Paragraph 34 was, and we'll do whatever the Court wants on that, and we understand the Court's point. If the allegation in Paragraph 34 of the amended complaint was and she went and published it to the world, okay, that might be something outside.

THE COURT: No, it's not even if she went and published it to the world. If the allegation is and upon information and belief she -- aside from those --

that chain of e-mails that took place between Denbo and Kenny, okay, if she went and made the allegation whether it was by a writing or whether she called him up, it didn't have to be the provost, if it was one of those people that she previously told and she said he stole. If the allegation had something that doesn't require, because the arbitrator isn't -- can't reach the issue of intent.

MR. GERBER: Oh, I don't know, Your Honor. I think that that in fact is entirely up to the arbitrator and that's why a decision on the merits here would be inextricably intertwined. An arbitrator has exclusive authority. Arbitrators get it right, arbitrators get it wrong. Arbitrators make decisions that the court might disagree with. Arbitrators make decisions that union management might disagree with.

In this case the arbitrator also has the right to impose the level of discipline. Some arbitration agreements are not like that. This one's specific. The arbitrator's decision is final. It is tested at best on appeal under the most unique circumstances. If the arbitrator felt in this case that Mr. Kenny (1) either somehow could show that he didn't use it in an unauthorized way, i.e., his allegation that the department chair gave it to him and



somehow that was authorization, or (2) that he didn't do it intentionally he could well find for the grievant Professor Kenny in the arbitration. And we may not know what he did. But he certainly could do that.

In fact, at the arbitration Mr. Kenny was preparing, and I believe opened on that it wasn't unauthorized, that he had consent. So those very same issues would be there now. I suspect, Your Honor, that an arbitrator, if he found it was unauthorized, that is to say Professor Denbo never authorized it, and Mr. Kenny arguably mistakenly thought he was authorized that there still would be a violation, it could find, and maybe the discipline would have been the same as they settled for. Maybe it would have been less. Maybe it would have been more. It still could have been found by the arbitrator to be a violation of the CBA.

If the University proved that Mr. Kenny was lying well, you know, maybe the arbitrator would have terminated him from the University.

THE COURT: Well, maybe -- and I don't know if this article's been cleared up, but since we're arguing what is -- requires interpretation under the CBA I probably should have the whole CBA. So if you're going --

MR. GERBER: We will submit the entire CBA, Your Honor, with a supplemental certification certifying it was the one in effect. We will also address the Court's understandable query about the chain of events and that this was the chain of events that started the disciplinary process.

THE COURT: Okay.

MR. GERBER: Thank you, Your Honor.

THE COURT: All right. Mr. Kenny.

MR. KENNY: Very briefly, Your Honor. The defendants are inherently contradicting themselves when they say that Susan Denbo communicated only with those five people, somehow it made it to the provost. So at least the provost was -- received a copy of those e-mails. Without --

THE COURT: I'm saying it could -- one of the five people that she gave it to they in the chain of command could have given it to the provost. Or they could have made the decision and then by your filing the grievance the provost got involved. I mean, I'm not that as concerned about how did the -- necessarily. I'm concerned as to what was said to, as we argued last time, to start the ball rolling.

MR. KENNY: Correct. I --

THE COURT: And frankly I think even in --



and just -- I don't mean to interrupt you, but it's going to get to the point on truth is the absolute defense. Well, I really need to know exactly what the alleged defamation is before I can determine whether or not it's true or not. If the alleged defamation is he -- there was an unauthorized use of my syllabus, or I think he used my syllabus, well, I don't know that that's -- those things are defamatory. If it's he stole, well that involves an element of intent and I don't know that that's been proven as true, because you came to an agreement without any, you know, admission of guilt, right?

MR. KENNY: Right. There was no adjudication. There was a settlement without admission of wrongdoing. This is a unique situation. In a lot of the cases in the <u>Norge</u> (phonetic) case you had adjudications in some cases that said the party was guilty. We don't have that here. We've got a settlement which avoids finding fault that I was guilty of wrongdoing. Because I wouldn't have signed anything else.

I think it is relevant if she merely says I made unauthorized use knowing that she had given the syllabus to the department head for the express purpose of giving it to me I think that's defamation. Even if

she's just claiming unauthorized use if she knew all these facts that she put it out on the blackboard, that she gave it to the department head with the express purpose of giving it to the adjunct, which turned out to be me, and also if --

THE COURT: I think she said I gave it to him and I don't know did she take issue with the fact that he gave it to you. But she said I thought you would just use it, maybe call me, and we could discuss it. Or you could use it kind of as a template, but that you wouldn't post it. That you wouldn't take it in -- and I know, you know, you say well you modified it and you didn't intend to use it, you were going to take that off and do your own or modify it even more. But that was her issue, right? It was with the posting. Not that you had it, not that you could utilize it.

MR. KENNY: It's hard to say. She accuses somebody of unauthorized access. She made an allegation about my ethical character. I think those questions are determined by whatever the recipients interpreted her e-mail as. Did they understand, oh, he got it from the department head, but he didn't go back and get specific permission from Dr. Denbo? Is that what they understood. Or did they understood hey, this was unauthorized, he hacked into her blackboard



account? That's the gist of those rage e-mails.

So I think without discovery you don't know if other University employees, not just Dr. Denbo, disseminated those e-mails further. I think the University is liable for that not just what Susan Denbo did.

Without discovery we don't know who else got those e-mails. Keep in mind we don't have an adjudication here. We have settlement on both sides without admission of wrongdoing. That means what it says. There was no determination that I did any wrong. The rest --

THE COURT: Is that your argument though that if that's not the standard that the standard is whether or not what would be decided here would have had to have been required an interpretation of the collective bargaining?

MR. KENNY: Right. That's exactly right. I think if you look at the Norge case, supreme court case, the Prudential case which is in this district they all say it doesn't matter if you have to decide the same facts. It doesn't require an interpretation of the collective bargaining agreement. The amended complaint makes no claim that it's not intellectual property. Once you assume it's intellectual property

-- and incidentally the agreement does not say you can't use somebody else's syllabus. It says nothing about consent. It says nothing about -- it simply says this is intellectual property. Okay. We're not challenging that. What we're challenging is did she tell the truth when she told five other people including two colleagues who have no managerial authority that --

THE COURT: And you're saying -- when you say this is intellectual property you're saying this is her intellectual property. You're saying you conceded that.

MR. KENNY: Well, except that I think we've subsequently found out that it was presented as the department's syllabus. It is intellectual property, number one. Number two, the department shares conduct is completely inconsistent with her ownership. He presented it as the model syllabus for the department when the course began. No attribution, no copyright rights. So we're challenging two things. Did she own it? Did she have exclusive ownership? And two, did she tell the truth when she told those five people, and God knows who else by spreading the e-mail, that I had unauthorized access to her syllabus?

THE COURT: Okay. But now when you say



you're challenging did she own it isn't that an issue that requires interpretation of the collective bargaining agreement?

MR. KENNY: No. We acknowledge -- may I? We acknowledge that under the definition, this may be the first case in the country where a professor has asserted intellectual property rights against another professor in a syllabus. Okay. Generally copyrightable works are creative works. Anyway, we concede under the contract it is intellectual property. Whose intellectual property is not determined by the collective bargaining agreement, but whether she consented to the use of her syllabus as the department's model syllabus, or it's not hers to begin with in a sense that other department members contributed to it.

Whatever was in Chairman Sprotzer's mind when he (a) gave me the syllabus, and (b) presented it to the committee as the department's syllabus, without discovery we don't know what motivated that. Maybe he doesn't agree that it belongs to her. It is intellectual property. It is intellectual property under the contract. Who owns it?

THE COURT: Okay.

MR. KENNY: Did she own it, and did she tell

the truth when she said my use of the syllabus was unauthorized?

THE COURT: All right.

MR. GERBER: I'm sorry, Your Honor.

THE COURT: Just briefly, because we have to move on to the other points, and then I'm going to have to wait until I get the certification. And I'm not going to hear any further argument. I'm just going to read the certification that she had, and the -- have the whole collective bargaining agreement so I can refer to it, and then I'll issue my decision. But go ahead.

MR. GERBER: I'll be brief, Your Honor. But just to buttress the point that the Court's question posed to Mr. Kenny. His amended complaint, Paragraph 34 says, the 1999 revision to the collective bargaining agreement with the faculty provides in Article XXXII that between Rider and the faculty member all intellectual property is that of the author and not Rider. If that's not the interpretation of the collective bargaining agreement that's an allegation he makes in his complaint, a predicate.

Two, Article XXXII, CBA, also provides that the University encourages sharing of intellectual property without restriction. That's an interpretation



of the CBA.

Article III -- his argument -- nothing precludes the author from giving you permission to use the syllabus directly or indirectly. That is another interpretation of the CBA.

And Exhibit A to Professor Denbo's certification has her name on it. First page right below the course title. Mr. Kenny's course syllabus, and I'm using Mr. Kenny's in quotations, is Exhibit D and it has his name on it. And the Court can compare them. There's no dispute those are the syllabi.

I do have one last comment, Your Honor. I just read Paragraph 34 of the complaint. He relies on Norge. I call it (indiscernible), okay. It's the first case of the supreme court following (indiscernible). And he writes, in other words, even if dispute resolution pursuant to collective bargaining agreement, this is Norge, on the one hand and state law on the other hand would require addressing the precisely same set of facts whether it's unauthorized, whether it was stolen, whether it was whatever, as long as the state law claim can be resolved without interpreting the agreement itself the claim is independent of the agreement. It can't.

The issue of whether it's unauthorized -- the

issue of whether it's her syllabus a faculty member's rights can't be beyond dispute, and it's set forth in the CBA. So therefore the very fact that he wants to argue that there's no unauthorized use consent provision requires an interpretation of the CBA and makes it inextricably (indiscernible) and under all the other cases.

Your Honor, we've submitted a reply brief on the Tellez issue. Suffice it to say, Your Honor, that it's just not applicable, it's inept, it's not good law. I did want to comment very briefly on Prudential. Okay.

THE COURT: Yes.

MR. GERBER: Prudential is not a circuit decision, it's a decision of this district court. So is Kozlowski (phonetic). Notably this is an NASD case. In other words, this is a case brought by sales agents for an insurance company who registered under the SEC laws alleging the company fired them for participating in illegal sales practices. It's a whistle blower's claim. One of them claimed defamation as well. Okay.

The retaliation claim survived under state law as a discrimination LAD claim would survive under state law here in most circumstances, quote, without substantial reference to much less interpretation of



the CBA the Court preempted the tortious interference claim, allowed the defamation claim to survive. Why? At Page 652 of the Court's opinion, in this case the alleged defamatory statements were not even arguably made as part of any procedure or proceeding carried out in pursuant to the CBA.

In that case the plaintiff alleged that after his employment Prudential informed individuals that he was investigated for unethical conduct. Similarly the Court distinguished Kozlowski because here those post-statements particularly had nothing to do with the truth or falsity of the -- of those statements with the CBA process. And I'm prepared to argue the other point, Your Honor.

THE COURT: Okay. Let's move on to the other points. As I said, I can't deal with your point about truth until I get some clarification on --

MR. GERBER: So you want me to put truth aside then.

THE COURT: Yes.

MR. GERBER: Okay. Very good, Your Honor, I'll try and do that. Just give me a second to reorganize my thoughts here. I'd just like to add one comment since I won't have another chance to discuss truth on the substance. Mr. Kenny argues that nothing

in Article XXXII, the clause giving intellectual property rights to the faculty member precludes the author here Denbo from giving her permission to use the syllabus either directly or indirectly through the department chair. We just heard that, or through the blackboard system.

This appears to me to be a view that's a predicate to the following allegations in -- where he says -- where he somehow attempts to argue how he, quote, legitimately got the materials through the blackboard. And I think this relates to truth in one way, Your Honor. If Article XXXII does apply to the syllabi, and if it precludes the author of the syllabus, Dr. Denbo from giving permission to the department chair, Mr. Sprotzer, or giving permission through publication on blackboard, the website of -- the internal website, if it does preclude it then Kenny stole the material.

If he stole the material from Dr. Denbo then assuming arguendo that she in fact accused him of theft of assignments or resources not before this Court, an allegation on information and belief, then he stole the material. Truth would apply. The only way to resolve this -- that material fact returning just for the moment is for the Court to decide, like Kenny's



complaint, an interpretation of the CBA.

So let me turn to the other points, Your Honor, the Court wants to hear about, just briefly. We have an argument about standing, Your Honor. The standing -- may I have one second, Judge?

THE COURT: Yes.

MR. GERBER: Sorry, Judge. The standing argument is addressed in our moving brief. It starts on Page 16. And I'm just going to just briefly touch on this. Under the <u>Fleming</u> case, and more importantly I think even under the <u>Thompson</u> case, you know, if you went through the whole process on a CBA and where the CBA requires arbitration as the motive redress ultimately. An arbitration award is final, binding, and there's no standing to attack it.

THE COURT: But he's not really attacking the arbitration award, is he?

MR. GERBER: Yeah, he really -- well, he's attacking the arbitration process.

MR. KENNY: May I interject? There was no award.

THE COURT: All right. Well, they award the settlement -- I don't even know that he was attacking the process. He's filing a claim for defamation.

MR. GERBER: Let me turn to the privilege

issue, Your Honor.

THE COURT: Yes. So on that point, let me just say it now, that one I'm going to deny --

MR. GERBER: On standing.

THE COURT: -- on standing issue.

MR. GERBER: Very well, Your Honor.

THE COURT: I'm denying your motion to dismiss based on that.

MR. GERBER: Your Honor, I'd like to turn next to because the alleged defamatory remarks were in connection with an investigation, grievance and arbitration they're privileged as a matter of law. I understand from the Court's colloquy this morning the Court wants us to fill the hole on the unsupported on information and belief which by the way, usually requires some information and some belief allegation. I've heard none other than supposition.

But in any event under Fleming statements made to an arbitration panel are absolutely privileged. Statements made pursuant to the grievance in an unemployment process in Kozlowski were absolutely privileged. We think Kozlowski is squarely on point. Former district court judge and former superior court Judge Wolin -- Alfred Wolin wrote as follows. Federal labor law promotes the collective bargaining agreement



as a means of stabilizing the relationship between employers and employees erecting a system on industrial self-government.

Actually, Your Honor, I wish I had quoted him at the beginning of my last argument. He put it more quickly than I have. The grievance machinery under the CBA is at the very heart of this and is actually a meaning by which meaning and content are given to the collective bargaining agreement citing one of the three U.S. Steelworkers trilogy cases from the supreme court in 1960 which began to do that.

THE COURT: Okay, counsel, I'm just going to move you along, because I don't think that's where my concern lies. My concern lies with what was said, if anything else other than these e-mails? So I understand your point she was just notifying them, she was getting the ball rolling, but I want to see whether that was actually all that was said.

MR. GERBER: Your Honor, so I am not going to have to thereby address if I understand the Court's direction McCay (phonetic) and truth is an absolute defense --

THE COURT: Right.

MR. GERBER: -- for whatever she said whether she said she stole it or she didn't steal it truth

would be an absolute defense. Okay. The e-mail that we do have before the Court refers to unauthorized access to her syllabus or intending to do so. That was an allegation in a complaint. If those are the allegations I see that there is no way that the Court could intercede, but I think that also it has to accept those as true, because of the arbitration process.

Let me turn to the qualified or conditional privilege which is, I assume, where the Court wants to hear from me the most.

THE COURT: Yes. Well, there, and then the other -- the two points of -- I'll hear from Mr. Kenny on that.

MR. GERBER: On the invasion of privacy and false light?

THE COURT: Yes.

MR. GERBER: A person who makes a defamatory statement is by law, i.e., calling somebody a thief. That would be slander per se, okay -- so we'll even treat it as a per se defamatory statement -- is not subject to civil liability, i.e., cannot be successfully sued if there's a qualified or conditional privilege. And that's the Erickson case.

And in New Jersey under the case law one cannot -- private people cannot be sued for expressing



private concerns to limited and correlatively connected audiences. I wouldn't have been able to write that. That's Bainhauer. That's 215 N.J. Super. 9 at Page 36 (App. Div. 1987). And what the court went on to explain, thus otherwise defamatory comments, i.e., hypothetically although not in fact calling somebody a thief in connection with the workplace as in my hypothetical, are accorded the privilege where the publisher, the speaker, is protecting an interest common to the publisher and the recipient.

The common interest here is the academic ownership under the CBA accorded intellectual property rights. The University has agreed that we're going to give that to our faculty. Maybe we're going to pay our faculty less money, because they get that intellectual property. There was a bargaining of that. So it's not just the faculty member who has an interest in that, it's the University.

To whom did she write the e-mail that's the subject? The department chair, two other tenured members of the faculty. Your Honor, I'm sure having been through (indiscernible) in seven years understands that there are both tenured professors and untenured professors. Tenured professors comprise a departmental promotion and tenure committee. The department chair

is oftentimes elected by those tenured faculty members as is the case at this university. So that is kind of like, you know, for all we know the other professor might be the chairperson the year before. They are the leadership of the academic department. They report to the dean.

A common interest privilege which is what's at issue here is defined as a communication made bona fide, and if you look at the string of e-mails that she forwarded which included his responses, bona fide upon any subject matter in which the party communicating that interest has an interest, which she has under the CBA, or a duty. And it is privileged if made to a person having a corresponding interest or duty although it contains incriminatory matter which without the privilege would make it slanderous or liable as to actionable. And that's the Coleman case. And that's the New Jersey supreme court case versus Newark, then -- now Newark Star Ledger, then the Newark Morning Ledger, 29 N.J. 357 at Page 375.

THE COURT: Counsel, and like I said, I did read the brief, and this is all in the brief so again I'm going to move you along. But again I think on this issue in all fairness I do need again to see what she claims would or would not (indiscernible). Are these



the e-mails? Is that the full universe of what I'm looking at?

MR. GERBER: Right. Okay. Your Honor, and just for the Court and its staff the Feggans case (App. Div. 1996) makes it clear that qualified privilege includes statements by an employee when reporting to a supervisor as opposed to management. Misconduct by supervisors.

If I can have the opportunity, if the Court permits me I'll just quickly go through the invasion of privacy and invasion of false light.

THE COURT: Okay. Well, on that one let me just ask Mr. Kenny on that one. On those points I think those points are the weakest points of your complaint. But how is this -- how did you have a reasonable expectation of privacy in this issue? This isn't necessarily a private affair.

MR. KENNY: Yes, Your Honor. The disciplinary procedure and the grievance procedure are private and they're private for a reason. Trying me in public violated my expectation of privacy.

May I address the rest, Your Honor?

THE COURT: You can respond and then I'll have --

MR. KENNY: Okay. What you got here, I think

is a double bootstrap. They're claiming that the rage e-mails were an integral part of the disciplinary process, and since they're an integral part of the disciplinary process that therefore an integral part of the grievance process which took place five months later.

Without discovery we don't know what other conversations Susan Denbo had with peers, colleagues, supervisors to dismiss the complaint without factual findings or who else she communicated with either slander or liable is inequitable.

And I don't know how you can determine the common interest privilege which is a qualified privilege without more fact finding. And then just one little footnote, yes, it's true Susan Denbo's name was on the syllabus that I copied. I make no pretense. I made eight changes, but, you know, I copied her syllabus just as I had done many times before. Every syllabus I ever copied had somebody else's name on it.

THE COURT: Okay. Mr. Gerber.

MR. GERBER: The Court identified the tort and it's really the same tort or a similar tort. One is false light and one is for invasion of privacy. But one central element that applies to both those torts -- both is favored torts, by the way, just as defamation



is a favored tort -- require an invasion of privacy. I don't know how, Your Honor, the alleged e-mails or any alleged communication to somebody at the University about either unauthorized use or stealing my syllabus can be a matter of, quote, his privacy. He used the syllabus in his capacity as an adjunct assistant professor or adjunct teaching assistant for the University. Adjunct faculty member.

It was not private, it was public. It's at a university which is in public. There is no way that I think that any court has held in any like circumstance, and I think the absence of case law pointed out by Mr. Kenny who's an able attorney points that out. A matter will not be deemed private if the employee did not have a reasonable expectation of privacy. That really doesn't matter what he is saying now. And that's, of course, in the Hart case which is cited in our brief. It's (App. Div.) -- 308 N.J. Super. 47 at 393.

And the elements of false light invasion of privacy is one gives publicity to a matter concerning another that places the other before the public in a false light. And the false light in the other would be highly offensive to a person with reckless disregard to the falsity. There's no way he satisfies either element, one or element three of that in his pleading.

It clearly was not before the public. Thank you, Your Honor.
THE COURT: Thank you. Mr. Gerber, when are you going to get -- again, I'm not taking any further -- I just want the certification. I don't want any further argument.
MR. GERBER: Certification from Professor Denbo about what she said to whom and what she wrote to whom.
THE COURT: Right. And the copy -- give me a copy of the full collective bargaining agreement.
MR. GERBER: And the full collective bargaining agreement. Your Honor, that one I'm not going to ask her to certify to. I'll do a supplemental certification for Dr. Castagnera or some other University officer. May I confer with --
THE COURT: Yes.
MR. GERBER: Your Honor, at the risk that I'm due back on Monday, but I have a partner, I think that we should be able to get that to the Court by next Friday. If we have a true event, a true emergency Monday and Tuesday --
THE COURT: Just let me know.
MR. GERBER: -- I would ask for week -- the day before election day or the day after election day.



Only if we have an event that shuts --
THE COURT: That's fine. That's fine. And I'm just thinking of when we can give you. I think we have a telephone decision so you don't have to all come down again.
MR. KENNY: Your Honor --
THE COURT: Well, it'll be sent to you, Mr. Kenny. Now, if there's something in the certification that you, you know, find is --
MR. KENNY: Well, my --
THE COURT: -- not argument, but where you -- if you want to take issue with something --
MR. KENNY: Factual.
THE COURT: -- of fact then you can submit something.
MR. KENNY: Well, the one thing I'm confused about is if other University employees publicized the allegation other than Susan Denbo, is that not relevant on the University's defamation count?
MR. GERBER: Your Honor, I am just dumbstruck. I am dumbstruck as follows. Mr. Kenny has provided interviews to the Chronicle of Higher Education and the Rider University Student Press about his lawsuit. The University's comment was the matter is in litigation we have no comment. Thank you.

THE COURT: At this point, I mean, I'm looking at Denbo's comments, how they -- what she said, to whom she said it. I want that certification. As far as --

MR. GERBER: And any that were in writing have them all attached so you can see them in one spot.

THE COURT: Yes.

MR. GERBER: I'm sorry for being seated, Your Honor.

THE COURT: No. That's fine. And as far as what others may have said, I mean, at this -- it's very speculative. And as I said this goes also to the heart of the preemption. So I'm not going down that road now.

MR. KENNY: Okay.

THE COURT: All right. And let me just give you a date so we can carry this to. We'll say --

MR. GERBER: Certification by the day -- Judge, I just heard on the radio -- may I, Your Honor?

THE COURT: Yes, I know, the storm.

MR. GERBER: And they now say more likely than not.

THE COURT: Okay. You can get it on the day after election day which is the 7th.

MR. GERBER: Yes, it is, Your Honor.



THE COURT: Again, Mr. Kenny, I'm not saying you're going to be filing anything. Again, only if it's factually --

MR. KENNY: Understand.

THE COURT: -- that you have and you have facts to support that it's wrong. Okay. And what we'll do is I'll list it for decision then -- okay, if, Mr. Kenny, you are going to get anything and get it in by the 12th and I'll list it -- I'll just carry this to November 16th. That is a motion day. Here's the problem with that, it's the only motion day in November. I have a feeling it's going to be really heavy. So I don't know that we're going to -- I'm going to carry it in the system until then. We may have to move it. But it's not going to require an appearance anyway, because we'll do it by phone. So this way if you call in a couple days ahead of time we'll tell you if that sounds real or not, and what time. Right now we'll say at 1:30, but it -- so right now 1:30 just to kind of keep that date and a time. But call in a few days ahead of time and we'll give you -- see how realistic that is.

MR. GERBER: And, Your Honor, I also wanted to thank the Court, as well as Mr. Kenny for the courtesies in allowing us to start at ten this morning.

THE COURT: Okay. That's fine.
MR. GERBER: Thank you, Your Honor.
MR. KENNY: Thank you, Your Honor.
THE COURT: You're welcome.

* * * * *

**C E R T I F I C A T I O N**

I, KIMBERLY UPSHUR, the assigned transcriber, do hereby certify the foregoing transcript of proceedings on compact disk, playback number 10:21 a.m. to 11:27 a.m. is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate compressed transcript of the proceedings as recorded, and to the best of my ability.

Kimberly Upshur
KIMBERLY UPSHUR AOC#528
J&J COURT TRANSCRIBERS, INC. Date: 5/23/13